[No. 33113. *En Banc.* September 22, 1955.]

ARTHUR R. LOOMIS, *Appellant*, v. DOLLY A. LOOMIS, *Respondent.*[1]

*Hall, Cole & Lawrence* and *Stanley F. Atwood*, for appellant.

*Oliver J. Neibel, Jr.*, and *Luvern V. Rieke, amici curiae.*

WEAVER, J.—Do the courts of this state have the power, under existing statutes (Laws of 1949, chapter 215, § 11, p. 701; RCW 26.08.110), to grant alimony for the support of a spouse in a case of absolute divorce when there are no

[1] Reported in 288 P. (2d) 235.

minor or dependent children? This is a question of first impression in this court. See Alimony in Washington: A Note to the Legislature, 26 Wash. L. Rev. 135 (1951).

The predecessor of this court recognized that granting a divorce was a rightful subject of legislation by the territorial legislature, under the organic act of Oregon, in 1852. *Maynard v. Valentine*, 2 Wash. Terr. 3, 3 Pac. 195 (1880); *Maynard v. Hill*, 2 Wash. Terr. 321, 5 Pac. 717 (1884), affirmed 125 U. S. 190, 31 L. Ed. 654, 8 S. Ct. 723 (1887). The organic act of the territory of Washington (1853) did not change the rule. Laws of 1854, p. 39, § 12; Rem. Rev. Stat., Vol. 1, p. 322, § 12.

Although the first Washington territorial legislature provided that "divorces may be granted by the district court" (Laws of 1854, p. 405), it was not until the adoption of the state constitution, in 1889, that this power was taken from the legislature (Art. II, § 24) and vested exclusively in the courts. Art. IV, § 6.

█ Since the power to grant a divorce rests solely upon constitutional and statutory authority, it follows that the power to grant alimony rests upon the same basis.

The 1854 "Act Regulating Divorces" (Laws of 1854, p. 405) does not use the word "alimony." The statute does, however, provide that the court, pending a divorce,

". . . may make . . . such orders for the disposition of . . . property and children of the parties as may be deemed right and proper . . ."

and, upon granting a decree of divorce,

". . . shall also make such disposition of the property of the parties as shall appear just and equitable, having regard . . . to the condition in which they will be left by such divorce . . ."

The territorial supreme court first used the word "alimony" in *Madison v. Madison*, 1 Wash. Terr. 60 (1859). The trial court entered a decree of divorce, "and *alimony* and certain expenses were allowed to the defendant [wife] out of the estate of the plaintiff." Of this, the supreme court said:

"The Court, in this instance, instead of granting a sum absolutely to the wife, has decreed that a certain sum shall be put into the hands of a trustee, the interest to be paid to the defendant, quarterly, during her natural life, and at her death the principal to revert to the husband.

"This we think the Court had power to do under the section of the act referred to [which act is quoted *supra*]."

Here, we have periodic payments, out of future earnings of property of the husband, made to the wife for her support. This the territorial supreme court designates as *alimony*. It finds the power to grant alimony in its statutory authority to make disposition of the property of the divorced parties.

The seventh territorial legislature re-enacted the 1854 "Act Regulating Divorces" with some changes and additions not pertinent to the problem we are considering. The new act was passed January 23, 1860. We cannot escape the conclusion that the legislature was cognizant of the supreme court's decision in the *Madison* case, *supra*, for the re-enactment was entitled "An act to regulate suits for divorce and *alimony*." Laws of 1859, p. 318. (Italics ours.)

Subsequent amendments of the same act, as well as the Code of 1881, designated the subject matter as pertaining to "suits for divorce and alimony." Laws of 1860, p. 26; Laws of 1862, p. 413; Laws of 1863, p. 13; Code of 1881, §§ 2000-2013; see *Thorndike v. Thorndike*, 1 Wash. Terr. 175, 177 (1861).

Thus, we have judicial and, at least, implied legislative interpretation, that statutory authority of the court to make disposition of the property of divorced parties empowers the court to grant periodic payments of alimony to the wife.

From 1854 to 1921, the word "alimony" did not appear in the divorce statutes, except in the title of certain acts. We have referred to some of them. However, every practicing lawyer knows that courts allowed alimony during this period, when the facts warranted it.

Prior to 1921, the statutes provided for a single decree of "full and complete dissolution of the marriage." In 1921, the legislature changed the procedure and required that

" . . . an interlocutory order must be entered accordingly, declaring that the party in whose favor the court decides is entitled to a decree of divorce . . . *which order* shall also make all necessary provisions as to alimony." Laws of 1921, chapter 109, § 2, p. 332; Rem. Rev. Stat., § 988. (Italics ours.)

It is apparent that this amendment merely authorized the court to make an allowance of alimony in the *interlocutory order* of divorce, under the new divorce procedure requiring an interlocutory order, and then, six months later, a final decree of divorce; for the words "which order" can refer to nothing but the interlocutory order. Having established a system of divorce requiring two steps, it was necessary to define what could be ordered in each step. There was still left upon the statute books the exact language of the 1854 act, quoted *supra*, for the disposition of property. Rem. Rev. Stat., § 989.

In 1933, the act was amended to allow the court to modify divorce decrees as to "alimony and the care, support and education of children." Laws of 1933, chapter 112, § 1, p. 432; Rem. Rev. Stat. (Sup.) § 988.

The interlocutory order and six-month-waiting period caused many unfortunate legal complications. The state bar association committee on divorce law recommended that "there should be one decree only in divorce, that that should be a final decree." The reports in no wise suggest that the right to grant alimony should be abolished. See "Report on Proposed Changes in the Divorce Law of Washington," 22 Wash. L. Rev. No. 4, p. 17; "Report of Committee on Divorce Laws," 23 Wash. L. Rev. 320.

In 1949, the legislature enacted the present divorce statute, under which it is urged that the courts do not have the statutory authority to award alimony in a divorce action. The pertinent portion of the statute reads as follows:

"If the Court determines that either party, or both, is entitled to a divorce or annulment, judgment shall be entered accordingly, granting the party in whose favor the Court decides a decree of full and complete divorce or annulment, and making such disposition of the property of the parties, either community or separate, as shall appear just and equi-

table, having regard to the respective merits of the parties, to the condition in which they will be left by such divorce or annulment, to the party through whom the property was acquired, and to the burdens imposed upon it for the benefit of the children, and shall make provision for costs, and for the custody, support and education of the minor children of such marriage. *Such decree as to alimony* and the care, custody, support and education of children may be modified, altered and revised by the Court from time to time as circumstances may require. Such decree, however, as to the dissolution of the marital relation and to the custody, management and division of property shall be final and conclusive upon both parties subject only to the right to appeal as in civil cases." Laws of 1949, chapter 215, § 11, p. 701; RCW 26.08.110.

In the main, the language used in the present statute is carried forward from statutory provisions existing prior to 1949. The phrase "disposition of the property of the parties" has appeared since the territorial divorce act of 1854. The right to modify such "order [decree] as to alimony" springs from the 1933 amendment. Laws of 1933, chapter 112, § 1; Rem. Rev. Stat. (Sup.), § 988.

If the trial court's decree awarding alimony in the instant case is to be sustained, it must be done on the ground (1) that the authority to make a disposition of the property of the parties includes the authority to award alimony; or (2) that the authority to modify "such decree as to alimony" necessarily implies the power to award alimony in the first instance.

Having sketched the background of the present statute, we turn now to certain opinions of this court. We eliminate from our consideration the many cases in which alimony has been recognized (see *Patrick v. Patrick*, 43 Wn. (2d) 139, 260 P. (2d) 878 (1953); *Valaer v. Valaer*, 45 Wn. (2d) 565, 570, 277 P. (2d) 326 (1954)), and confine ourselves to those cases in which the *statutory* right to award alimony has been questioned and discussed.

In *Valaer v. Valaer, supra,* this court said:

"There are many definitions of 'alimony' to be found in the decisions of the courts, and while they differ more or less as to details they all agree that primarily alimony is an

allowance in a divorce action to the wife from the husband for her support, in lieu of the legal obligation of the husband to support her. 2 Nelson, Divorce and Annulment (2d ed.) 5, § 14.02." (p. 570)

In *King v. Miller*, 10 Wash. 274, 38 Pac. 1020 (1894), the former wife sought to foreclose a lien on her husband's property for alimony awarded her, which was to be paid "so long as plaintiff remained unmarried after the children attained their majority." The former husband argued that the court had no power to compel him to pay monthly allowances for his former wife's support after a decree of absolute divorce. There having been no appeal, this court held that the allowance of the award was *res judicata*. The court's further statement that "it was a good allowance as to the children, and could, at least, be sustained as to them," is *dictum*.

In *In re Cave*, 26 Wash. 213, 66 Pac. 425 (1901), the husband was jailed for failure to make monthly payments of alimony to his former wife, who had been granted custody of their three minor children. In support of his petition for release upon writ of *habeas corpus*, he argued that the statute did not provide for permanent alimony. This court said:

"We cannot agree with counsel for petitioner that the statute does not provide for such alimony. While no express authority is found in the statutes of this state for permanent alimony *eo nomine* after divorce, § 5723, Bal. Code, provides:

" 'In granting a divorce, the court shall also make such disposition of the property of the parties as shall appear just and equitable, having regard to the respective merits of the parties, and to the condition in which they will be left by such divorce . . . ' [Compare with wording of present statute.]

"There are no restrictions upon the court as to the manner of such disposition. It may be disposed of in a lump sum, or by installments monthly or otherwise, and subsequently reduced to a lump sum. . . . This method of disposing of the property of the parties, call it alimony or whatever name you will, has been recognized by this court in a number of cases." (p. 217)

. *Madison v. Madison, supra,* was cited with approval.

In *Mahncke v. Mahncke,* 43 Wash. 425, 86 Pac. 645 (1906), the divorced wife was granted monthly alimony until further order of the court. Minor children were not involved. This court again recognized that the power to award alimony springs from the statutory authority to dispose of the property of the parties, saying:

"We have heretofore held that Bal. Code, § 5723 (P. C. § 4637), confers upon courts of this state power to award permanent alimony in the form of monthly or annual payments for support and maintenance. *In re Cave,* 26 Wash. 213, 66 Pac. 425."

There is merit to the suggestion that this statement was not necessary to a decision of the case. However, it does disclose the thinking of this court at that time upon the question.

In *Claiborne v. Claiborne,* 47 Wash. 200, 91 Pac. 763 (1907), the court refused to meet the question involved here. However, on the theory that the statute is broad enough to authorize the court to decree to either party having the care of children, sufficient support for both the child and guardian, it sustained monthly alimony for the support of the wife and minor child. None of the prior cases we have discussed are cited in the opinion.

Next, chronologically, we mention *Cotter v. Cotter,* 225 Fed. 471 (C. C. A. 9th; 1915), in which the court held that, under the Washington statutes authorizing the equitable disposition of the property of the parties, the superior court has power to award permanent alimony in the form of monthly payments for the support and maintenance of the wife.

In *Krieg v. Krieg,* 153 Wash. 610, 278 Pac. 223 (1929), the property had been divided by mutual consent; there were no minor or dependent children. This court did not find it necessary to answer the husband's argument, that the statute did not authorize a monthly allowance of alimony *at the time of the marriage,* because, at the time of the divorce, the statute specifically authorized an allowance of alimony

in the *interlocutory order* of divorce from which the husband appealed.

In *Warning v. Warning*, 5 Wn. (2d) 398, 105 P. (2d) 715 (1940), the husband challenged the power of the court to award monthly alimony to the wife "until her remarriage or until the further order of the court." There were no children. Although the statute in force at the time of judgment provided for the allowance of alimony in the interlocutory order, this court chose to resolve the problem as follows:

"We shall first consider the question of whether the respondent was entitled to alimony. Rem. Rev. Stat., § 989 [P. C. § 7508], provides that, in granting a divorce, the court shall make such disposition of

" '. . . the property of the parties as shall appear just and equitable, having regard to the respective merits of the parties, and to the conditions in which they will be left by such divorce, and to the party through whom the property was acquired, . . .'

"While alimony for the wife is not specifically mentioned in the statute, it has been held that it is included within the phrase 'property of the parties.' [Citing cases.] Even though the divorce decree was entered on account of the fault of the respondent, this does not in itself deprive her of the right to an allowance as alimony. [Citing cases.]"

Since 1854, this court and its predecessor have held that the statutory power to dispose of the property of the parties in such manner as shall appear just and equitable in a divorce action, authorizes the allowance of alimony. Just as the 1921 amendment added nothing to this power (since it only changed the procedure and defined what could be done thereunder), the removal of the interlocutory order in 1949, as a step in divorce procedure, did not nullify the right to grant alimony, for that power still springs from other language in the present statute.

In addition, the present statutory authority to modify "such decree as to alimony" necessarily implies the power to award alimony in the first instance.

To this point, we have been aided by able oral argument and written briefs of *amici curiae* upon the law of the case.

Respondent wife, however, has made no appearance in this court. On appeal, the husband is represented by counsel other than the attorney who tried the case.

Plaintiff husband, fifty years of age at the time of trial, and defendant wife were married in 1924. Two daughters and a son were born to them. They were all of age at the time of trial and not dependent upon their parents.

During their entire married life, until his retirement as a chief petty officer, plaintiff was in the United States navy. He retired in 1946, after thirty years of service, with a monthly pension of $141.83, after insurance premium deductions.

Because of a limited government allotment from her husband's pay (eighty-five dollars per month prior to World War II; one hundred twenty-five dollars per month during the war), it was necessary that Mrs. Loomis work during most of this period in order to support the home and children. The court found, however, that she "is unskilled in any work which would make her employable on a permanent basis."

Until about September 1, 1952, Mr. Loomis worked at Boeing Aircraft Company. He had a "take home" pay of approximately two hundred eighty-five dollars per month. On that date he quit. He testified:

"I was just so darned disgusted with the lay-out of the house I had to tell them something and that was the excuse I used."

He was referring to a statement that he quit his job because he did not wish to work at night; it interfered with his attendance at lodge meetings four or five evenings a week.

On September 10, 1952, after an altercation with one of his *daughters*, Mr. Loomis left home. One daughter testified of her father, "He thought he was still on a quarter deck." The trial court found that "he demanded 'Navy discipline' in the home from the defendant and the two daughters of the parties and the parties' son."

For a year and a half prior to trial, except for two or three

short-lived jobs, Mr. Loomis has done no work for wages. He has done heavy work for his lodge "for friendship"— so he testified—in the development of a recreation center which, upon completion, he expects to manage without compensation, except for a place to live. During this period, he contributed forty dollars to the support of his wife. It is abundantly apparent from the record that Mr. Loomis' experience has not been conducive to the development of a sense of family responsibility. There is every indication that, smug in the security of his pension, he has, and has had for some time, no concern whatsoever for the welfare of his wife.

Mrs. Loomis, during this period, continued to live in the house owned by the community. Her two daughters and a friend of one of the daughters lived with her and each paid fifteen dollars a week board and room. Several months before trial, Mrs. Loomis had secured a part-time job which, she testified, was probably temporary because the proprietor was planning to move the business to another city. Her "take home" pay was $22.20 per week. Thus, at the time of trial, her average monthly income was $291.20. On the other hand, her average monthly expenses for the house were: fifty dollars for mortgage payments, forty dollars for utilities; one hundred thirty dollars for food, or a total of two hundred twenty dollars per month. Because she was unemployed during most of this period, there was unpaid at the time of trial: a dentist bill of two hundred fifty dollars; utility, store, and chimney repair bills totaling two hundred fifty-two dollars and two cents. In addition, she testified that she had been forced to borrow from her daughters a total of one thousand two hundred sixty dollars in order to meet expenses.

It would accomplish no useful purpose to further detail the facts leading up to this action. An examination of the record convinces us that the trial judge did not err when he dismissed the husband's action for a divorce at the end of his evidence; and, after her request for a trial amendment, granted the wife a divorce instead of entering a decree for separate maintenance.

In the decree of divorce, Mrs. Loomis was awarded the household furniture (valued at five hundred dollars), and the family home (valued at seventy-five hundred dollars), subject to a real-estate mortgage of $3,899, payable at the rate of fifty dollars per month.

Mr. Loomis was directed to sell the Willys station wagon of the parties and pay:

(a) $1,762.02 of community bills, which includes $1,260 borrowed by Mrs. Loomis from their daughters;

(b) $250 to Mrs. Loomis' lawyers;

(c) $100 to Mrs. Loomis; and

(d) $125 per month alimony on the "10th of each and every month, or pro-rata on each pay day as the plaintiff is paid *when he secures employment*." (Italics ours.)

In addition, Mr. Loomis was required to keep twelve thousand five hundred dollars of life insurance in force (premiums for which are being deducted before he receives his pension) without assignment or surrender, payable to Mrs. Loomis so long as she lives.

Thus, Mr. Loomis is left with his pension of $141.83 per month, and nothing else.

In a concurring opinion in *Ruge v. Ruge*, 97 Wash. 51, 70, 165 Pac. 1063 (1917), Judge Chadwick said:

"Society should concern itself to see that a tie that is broken between persons intolerable to each other does not become a club of revenge and hate in the hands of the one or a mill stone about the neck of the other."

We cannot say that the record in any manner indicates that Mrs. Loomis was reaching for a "club of revenge," but we do feel, under all of the circumstances, that the decree from which this appeal is prosecuted is in the nature of a millstone.

■ This action was tried May 20, 1954. It was not argued in this court until June 14, 1955. There were so many uncertainties, at the time of trial, that it would be unsatisfactory for us, at this late date, to attempt a solution of the division of property and alimony without knowing the present status of the parties. Mrs. Loomis' position may or may not have been permanent; her daughters and their

friend may have married or be living elsewhere. The automobile ordered sold has depreciated in value. Mr. Loomis may have awakened to his family responsibilities and secured a job. If not, there are remedies available to Mrs. Loomis.

In order that we possibly forestall another appeal in this case, we point out: (a) that circumstances might dictate that Mr. Loomis needs an automobile in order to hold a paying position; (b) that his pension is not in the nature of "future earnings," but is an asset acquired during coverture; (c) that the record discloses that certain insurance policies upon Mr. Loomis' life, in favor of some of the children, matured after he left home, the proceeds of which he turned over to the children. The present record, however, does not disclose the amount of the insurance.

The decree granting Mrs. Loomis a divorce is affirmed. However, we remand the case to the superior court for a new trial to consider only the division of the property and the award of alimony "as shall appear just and equitable, having regard to the respective merits of the parties," and "to the condition in which they will be left by such divorce."

It is so ordered.

HAMLEY, C. J., SCHWELLENBACH, DONWORTH, ROSELLINI, and OTT, JJ., concur.

MALLERY, J. (dissenting in part)—There is a gap in the divorce statutes upon the question of alimony. Judicial legislation, while proper in fields of the common law, is not permissible upon questions of public policy which inhere in divorce legislation and its related subjects.

The constitutional separation of powers among the departments of government will be better observed by permitting the legislature to bridge the gap it left in the law.

I dissent to the affirmance of the court's powers to award alimony and concur in the remainder of the majority opinion.

HILL, J., concurs with MALLERY, J.